have been rendered entirely useless for domestic purposes. In such cases, the injury done to the property of persons living on the stream is one for which the law provides no remedy, and which must be borne by the individuals for the general good.

What the facts are you must determine from the evidence. If the expense of conducting the salt water from said wells by means of pipes would not have been reasonable, the plaintiff can not recover. If the water in plaintiff's well was not spoiled before defendant's wells were drilled, and if it was spoiled and rendered unfit for use by salt water from defendant's wells permitted to flow into said run, and if said water could have been conducted away in pipes at a reasonable cost, you will next inquire whether or not the plaintiff himself contributed to the fouling of the water in said run and in his well; and this brings me to the third defense in the answer.

The substance of this defense is that before the drilling of the Evans and Bradfield wells the plaintiff had erected and maintained until after the bringing of this suit a family privy on said run above plaintiff's water well, and that about the 9th day of June, 1895, an oil well was completed on the lands of plaintiff which produced about the same quantity of salt water as said Evans and Bradfield wells, and that the same flowed into said run below said Evans and Bradfield wells and above plaintiff's water well, and it is claimed that if the water in said water well was spoiled and rendered unfit for use for domestic purposes by the percolation of impure water from said run, it was in part due to the contributory negligence of the plaintiff himself. The allegations of this defense are denied by the reply, and the burden upon the issue thus joined is upon the defendant. That is, the defendant is required to establish by a preponderance of the evidence that the allegations of his third answer are true. And you are instructed that if you find from the weight of the evidence that salt water from plaintiff's own oil well, or the filth

from his privy contributed in any substantial degree to the pollution of the water in said run and in said well, then the plaintiff cannot recover. To defeat the right of recovery, it is not necessary that the plaintiff should have contributed to the pollution of the water in the same degree that the defendant did, but all that is required is that the plaintiff should have contributed thereto in some degree. The reason for denying a recovery in such cases is that the amount of damages caused by each in such cases cannot be apportioned, and the plaintiff cannot be permitted to recover damages of another for an injury done by himself.

If the plaintiff has established his right to recover anything in this case under the rules I have given you, you will next proceed to a consideration of his damages. If entitled to recover anything, he is entitled to such an amount as will fairly compensate him for the injury done. This is the amount, if any, that his property is rendered less valuable by the pollution of the water in said stream for the time that it was rendered unfit for use for domestic purposes, as well as by the pollution of the water in said well and the rendering of it unfit for use, if you find that the water in either was rendered unfit for use by salt water from defendant's wells. If you find for the plaintiff, you will insert the amount in your verdict after the dollar mark. If the plaintiff has failed to establish his right to recover anything in this action, your verdict will be for the defendant.

(Verdict for defendant.)

---

(Superior Court of Cincinnati—1899.)

IN RE CONTEMPT PROCEEDINGS v. ROBERT D. GREAR, Jr., et al.

(1.) The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of property and civil rights. It has no jurisdiction to enjoin the officers or agents of the executive or administrative department of the government from the performance of some duty ordinarily belonging to such department for the protection of a purely political right.

(2.) The right of one seeking to be elect-

ed a delegate to a convention of a political party is a political right only; therefore an injunction restraining the officers of election from counting certain ballots cast at the election for delegates to such convention is void for want of jurisdiction, and the parties enjoined are not punishable for contempt for violating said order.

(3.) If illegal ballots are voted and counted for delegates to a convention contrary to the provisions of sec. 2948, Revised Statutes, the rights of the complaining parties must be enforced by appeals to the convention, or the offending parties may be punished criminally, pursuant to secs. 7043, 7057, 7058, Revised Statutes.

(4.) Political parties, being voluntary associations, the conventions of such parties are necessarily the sole judges of the elections, returns and qualifications of their member, and courts of equity can not restrain the members of such conventions or the members of the committees on credentials from arbitrarily seating certain delegates therein.

JACKSON, J.

On February 21, 1899, a number of petitions were filed in this court by a number of candidates for delegates to the Republican city convention to be held the next day, against the judges of election in different election precincts in the city. Each petition alleged that for the primary election which was to be held on said February 21, 1899, between the hours of 4 P. M. and 7 P. M., the opposing candidate for delegate to said convention had provided himself with certain unlawful ballots which had been printed contrary to law; that is to say, said ballots displayed and contained printed upon the face thereof a certain mark or device, to-wit, a shield with the likeness of a bird perched thereon, together with five arrows and a twig or branch of leaves, which said arrows and twig appeared to be grasped in the talons of the bird, by means of which one ticket might be distinguished from another.

It was alleged that said unlawful ballots had been distributed and that they would be cast and voted at said primary election, and that the same would be counted by the judges of election in the different election precincts; and that thereby great and irreparable wrong and injury would be done the plaintiffs, inasmuch as said

judges of election would immediately upon completion of the count, destroy by fire all ballots cast at said election; "thereby depriving plaintiffs of all means of questioning the result of said election, as proclaimed by said judges, and of all evidence thereof."

An injunction was therefore prayed, restraining said judges of election from counting any of the ballots cast as aforesaid, which displayed and contained printed thereon the likeness of a bird, in ascertaining the result of said election and in making the returns thereof. It was contended that the ballots in question were expressly prohibited by section 2948, which is as follows:

"All ballots for all elections (other than those conducted under the act passed April 30, 1891), shall consist of plain white paper with the name or names written, or of plain white news printing paper, not more than two and one-half nor less than two and one-forth inches wide, with the name or names printed in black ink, and with a blank space of not less than one-fifth of an inch lengthwise of the ticket after one name for each office; or in case two or more persons are to be elected to the same office, like space after as many of the names as there are persons to be elected to that office, and without any mark or device by which one ticket may be distinguished from another, except the words at the head of each; and it shall be unlawful to print for distribution at the polls, to furnish to any elector, or to vote any ballot other than such as herein prescribed; provided, however, that any name may be corrected, erased or written in pencil mark or ink."

On the afternoon of February 21, a hearing was had on the application for a preliminary injunction, a very limited time being allowed (not more than two hours) for arguments by counsel and the consideration by the court of the grave questions which have arisen out of this case.

The objection made to the allowance of the injunction was the inapplicability of section 2948 to primary elections. It was not argued or sug-

gested that the court was without jurisdiction in the matter; and upon consideration of the questions then presented, the court granted the temporary injunction sought.

Thereafter counsel for plaintiffs stated in open court that information had come to him of violations of the orders of the injunction. It was stated that there had been flagrant violations of the orders by the judges of elections themselves; and also by one Robert D. Grear, Jr., clerk of the board of elections, in counseling and advising the judges of elections in the various precincts to disobey the order of the court; also by Rudolph K. Hynicka, August Herrmann, Vivian J. Fagin, Henry W. Kleemier, Charles S. Holder, Fred Dreihs and James F. Kushman, designating themselves as a committee on credentials to pass upon the admission of delegates to the convention aforesaid.

It was stated that the members of said committee on credentials had wilfully and contemptuously refused to seat certain delegates in the convention who had been duly elected thereto by the majority of the legal votes cast, and that they had thus indirectly at least disregarded the order of the court prohibiting the counting and consideration of said ballots containing the device of a bird thereon.

Thereupon the court appointed William Worthington, John F. Follett and Aaron A. Ferris a committee to investigate and report On March 24th, the committee so appointed filed in this court a report and specification of charges, charging that certain of the judges of election and that Robert D. Grear, Jr., and that the members of the so-called committee on credentials were in contempt of the orders and the process of the court, substantially as stated to the court by counsel for plaintiffs. The committee in addition thereto preferred charges against one Harry H. Hanover, and one Lewis Kushman to the effect that they were in contempt of the order and process of the court in counseling and advising certain judges of election to disobey said injunctions.

The parties charged were cited to appear on the 29th day of March to show cause why they should not be punished for contempt, and on that day they appeared in court and filed numerous motions to make the charges more definite and certain, which motions have been passed upon. Motions were also filed to dismiss as to all parties except those who were defendants in the injunction suits, on the ground that none but parties to a suit could be punished for contempt for disobeying an order of court.

Motions were also filed by all parties charged to dismiss for want of jurisdiction of the court to issue the injunction.

As this last motion goes to the root of the whole controversy, it will be considered first. The arguments upon the question of jurisdiction lasted a full week, and the questions involved are of the gravest nature, and most far-reaching in consequence, involving as they do the fundamental question of the power of a court of equity to interfere by injunction in election cases.

It is frankly conceded that, if this court, sitting as a court of equity, had jurisdiction over this general subject or class of actions, an erroneous ruling of the court applying section 2948 to primary elections, when in fact it properly applies only to the election of public officers, would not vitiate the orders, and that the parties charged would nevertheless be liable for contempt in violating the same. Indeed, if the court had jurisdiction of the parties and of the subject-matter, and if there has been a wilful and deliberate violation of the orders, however erroneously made, it merits alike punishment and the severest condemnation. No power given to a court is more essential to the protection and preservation of the rights of parties than the power to issue writs of injunction to prevent the commission of wrongs for which there would otherwise be no adequate remedy; and the maintenance of social order sternly demands obedience to such writs.

But if the court had not jurisdiction to hear and determine, then any order which it made was void, and a violation

of the same would not be punishable for contempt, however reprehensible might be the conduct of the parties for contemptuously endeavoring to thwart what appeared and was generally believed to be a valid process of the court.

But as to the moral offense of the parties charged, I do not desire to be understood as expressing an opinion, not having heard any of the evidence. Let us, therefore, look at this question of jurisdiction.

It is strenuously urged with great force, that conceding the application of section 2948 to primary elections, yet the court was without jurisdiction in issuing this injunction, because it is claimed that a court of equity has no jurisdiction to restrain any of the officers or agents of the executive or administrative department of the government from the performance of a duty generally and ordinarily belonging to them, for the protection of a purely political right, whether the act restrained be purely ministerial in character or involves the exercise of discretion; and it is contended that the right of one seeking to be elected to office and the right incident thereto to have none but legal votes counted, is a purely political right, quite distinct from a property or a civil right. It is said by defendant that a court of equity is conversant only with matters of property and the protection and maintenance of property and civil rights, and that it has no jurisdiction in matters of a political nature. They broadly assert that unless enlarged by express statute, the jurisdiction of a court of equity is limited to the protection of property and civil rights.

The protection of political rights, it is claimed must be sought in a court of law by one of the remedies known to the law for testing title to public office, such as quo warranto, mandamus, or certiorari, or else in the right to contest the election where the law gives him such right of contest; and that it is not merely a want of equity but a want of power for a court of equity to interfere by injunction in such cases.

Another consideration urged is that a convention of a voluntary association, such as the Republican party is conceded to be, must be the sole judge of the elections, returns and qualifications of its own members, and that it cannot be controlled in this regard by the action of courts.

It is contended that this latter fact presents a conclusive answer to charges against the committee on credentials, and also that it goes far to show that the court had no jurisdiction in the injunction against the judges of elections. Because, it is claimed, if it be conceded that the court had no control over the convention, it must then follow that it had no power to determine the result of the primary election, or what amounts to the same thing, to say in advance, what votes may and what may not be received and counted. For it is argued that the power of the court in the first instance, namely, to enjoin the counting of the ballots, must necessarily carry with it the power to make its order effective and to see that its orders in this regard are not held in contempt by anyone, and that it could therefore punish members of the convention for seating delegates in contemptuous disregard of the result of the order of the court as to counting ballots.

It is frankly conceded by counsel in support of the charges that if the sole and absolute control of the convention over the elections, returns and qualifications of its members be conceded, that the result would be as claimed by the defendants, namely, that a court of equity had no jurisdiction in the first instance to determine what ballots should be counted, for candidates for delegates to such convention. Indeed, we think the logic of the argument is unanswerable. But it is said in support of the charges that the convention has no such power as defendants claim; that the law providing for holding primary elections for delegates to conventions is not compulsory, but when a voluntary political association decides to hold an election under the law, then the convention has no power except as given by the primary election law, and that under section 2919 R. S. of Ohio, the con-

vention in passing upon contested elections is limited to the matters appearing upon the poll books and tally sheets, and that it cannot go behind them.

Section 2919 provides that the judges of the primary elections shall deliver to the candidate having the highest number of votes a certificate of his election and shall make out a summary statement of votes and dispatch it to the chairman of the committee of the party holding the election, and also deliver the poll book and tally sheet duly made up and certified to the board of elections.

The section further provides that the executive committee of the party or committee to be appointed by it shall canvass the summary statement in the hands of the chairman and declare the result; "and such committee in order to arrive at a correct result, may also consult and take into account the poll books and tally sheets in the office of the board of elections."

It is argued from this that the executive committee and the convention are precluded from taking into consideration anything not shown by the tally sheet and poll book, and that they are thus precluded from considering the illegality of any votes cast. Consequently it is said there is no way for a candidate for delegate to a convention to contest before the convention on the ground that illegal votes were cast, and no way to protect his rights against such illegal votes cast, except by an injunction; and that to deny an injunction in such matters would result in an express violation of the statute; that in fact there would be a wrong without a remedy, contrary to one of the cardinal maxims of equity.

In support of the charges it is also urged that the rights of the plaintiffs in the injunction proceedings were not strictly political rights. It is said that the rights of one seeking election to an office are different in this respect from the rights of the voter or citizen; that the former has a special right to protect, while the latter only the rights of citizens generally.

In short, while conceding the proposition that a court of equity has ordinarily no jurisdiction to restrain the officers of a department of the government for the protection of a purely political right, the committee, in support of the charges, assert that in the first place more than political rights were involved in the injunction suits, and also that from the nature of the case, there being no other remedy provided, equity must have jurisdiction, as the only means of preventing a wrong without a remedy.

In this connection they point to the fact that no rights of contest before any court in such cases, is given by the law, and that no time would be allowed to contest the title by proceedings in quo warranto

It is also asserted in support of the charges that the duties of the election judges with reference to counting ballots containing a device are purely ministerial. While on behalf of defendants it is urged that the duties are quasi judicial, or that they involve the exercise of discretion, and that in no case will injunction lie to enjoin a duty calling for the exercise of discretion.

The questions, then, to be determined are, first, what is the limit of equity jurisdiction over the class or subject here in controversy, involving a construction of the exact nature of the plaintiffs' rights as to whether they are strictly political or civil, and also the nature of the duties of the election judges, as to whether they are ministerial or involve the exercise of a discretion.

Second, is the convention of a voluntary association free from equitable interposition, and if so, how far, if at all, has the general power of such conventions been curtailed by section 2919? As to the first matter for consideration, I do not find any case in Ohio defining the limits of equity jurisdiction in these respects. In the case of Peck v. Weddell, 17 Ohio St., 271, the Supreme Court held that equity would not at the suit of a citizen and tax-payer, enjoin the clerk of a court of common pleas from recording the abstract of the vote in said county upon the question of the removal of

the county seat; that allegations of fraud and illegality in conducting the election constitute no sufficient ground for such injunction, and that wrongs of such a nature can be inquired into and redressed only by means of the contest of the election, pursuant to the provisions of the statute.

This does not, however, expressly hold that an injunction granted in such case would be void for want of jurisdiction.

In Reemelin v. Mosby, 47 Ohio St., 572, there was an application for an injunction on behalf of the then present incumbents of the Board of Public Improvements, to restrain the Mayor from appointing members of the Board of City Affairs under what was alleged to be an unconstitutional law. The allegations of unconstitutionality being admitted, the injunction was nevertheless refused. The court say, on page 572:

"As a general rule, a court of equity will not exercise its jurisdiction to control the conduct of public officers by injunction excepting when necessary to prevent a breach of trust affecting a public franchise, or some other illegal act under color of authority injurious to property rights of individuals. An injunction may be properly allowed, however, where parties are at issue concerning their legal rights, and it is necessary to preserve their rights in statu quo until the determination of the controversy. And we entertain no doubt of the correctness of the rule established by the cases referred to by counsel for the motion, which is, that the remedy by injunction may be employed by the incumbent of a public office to protect his possession against the interference of an adverse claimant whose title is in dispute, until the latter shall establish his title at law."

It will be noted in this case that the court does not expressly say that an injunction granted to control the conduct of public officers would be void for want of jurisdiction; but on the contrary, it is claimed in support of the charges that the language used in regard to the right of the incumbent of the office to interfere by injunction to protect his possession against the interference of an adverse claimant, expressly recognizes the general jurisdicion of equity by injunction in matters of political nature. I do not think, however, that this language (which was not necessary to a decision of the case) can be so construed as to support this contention, because in such instances there is no injunction granted against the officers or agents of the executive or administrative department of the government, as in the case at bar, but simply against a private individual claiming the office held by the incumbent. Moreover, there is a manifest reason for the allowance of an injunction under the cirumstances referred to in the Reemelin case, which does not exist in the case at bar. This reason is clearly pointed out by Judge Fenner, of the Supreme Court of Louisiana, in Guillotte v. Poincy, 6 South. Rep. 507, which case is cited by our Supreme Court in support of the general proposition stated in the Reemelin case. In the case from Louisiana the court recognized the well established rule that injunction is not the proper remedy to determine the title to an office, but gives as reasons for allowing an injunction to maintain the status quo until the title is determined, the following:

"This doctrine is in the interest of social peace and order, and conforms to the object and policy of the law in all remedial provisions for the settlement of disputed rights to maintain the status quo until the controversy shall be settled in the ordinary course of judicial procedure."

Consequently it must be said, that the case of Reemelin against Mosby does not expressly support the proposition contended for by either side herein. Let us look, therefore, to some of the numerous decisions cited by counsel from the Supreme Court of the United States, and from the courts of other states. A case which is one of the landmarks on this subject is the State of Mississippi against Andrew Johnson, President, 4 Wallace 475, which was an action brought to restrain the President of the United States from carrying into effect the

so-called "Reconstruction Acts" on the ground of their alleged unconstitutionality. If the acts were unconstitutional, as alleged in the bill, the strongest possible claim was presented, calling for the aid of equity, since under the operation of the Reconstruction Acts the laws of the states of Alabama and Mississippi were entirely suspended and the protection of life. liberty and property were placed under military rule established in their stead; and yet the injunction was refused; the court, speaking through Chief Justice Chase said on page 500:

"The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both when preformed are, in a proper case subject to its cognizance."

This case was followed by the case in re Sawyer, 124 U. S., 20, which I think, involved the determination of substantially the same questions as those involved in this case. The syllabus of that case is as follows:

"A court of equity has no jurisdiction of a bill to stay criminal proceedings.

"A court of equity has no jurisdiction of a bill to restrain the removal of a public officer.

"The circuit court of the United States has no jurisdiction or authority to entertain a bill in equity to restrain the mayor and council of a city in Nebraska from removing a city officer upon charges filed against him for malfeasance in office; and an injunction issued upon such a bill, as well as an order committing the defendants for contempt in disregarding the injunction is absolutely void, and they are entitled to be discharged on habeas corpus."

It will be seen that the question of jurisdiction was here directly involved by the proceeding in habeas corpus for the discharge of parties who had been committed for violating the order of the court. On page 210, the court said:

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution or punishment of crimes or misdemeanors or over the appointment and removal of public officers. To assume such a jurisdiction or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of officers, or for the removal of public officers, is to invade the domain of the courts of common law or of the executive and administrative department of the government"

On page 212 the court further said:

"It is equally well settled that a court of equity has no jurisdiction over the appointment and removal of public officers, whether the power of removal is vested as well as that of appointment in executive or administrative boards or officers or is entrusted to a judicial tribunal. The jurisdiction to determine the title to public office belongs exclusively to courts of law, and is exercised either by certiorari, error or appeal, or by mandamus, prohibition, quo warranto or information in the nature of a writ of quo warranto according to the circumstances of the case and the mode of procedure established by the common law or statute."

On page 213 the court quotes with approval from Kerr on Injunction as follows:

"The subject matter of the jurisdiction of a court of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests. The court has no jurisdiction in matters merely criminal or merely immoral which do not affect any right to property. Nor do matters of a political nature come within the jurisdiction of a court of chancery, nor has the court of chancery jurisdiction to interfere with the dues of any department of government except under special circumstances and when necessary for the protection of rights of property."

In this case there were dissenting opinions by both Mr. Chief Justice Waite and Mr. Justice Harlan, and the reasons given for their dissents show the questions which were considered by the court and enhance the importance of the decision in its application to this case. Mr. Justice Harlan in dissenting said:

"When a party has disregarded a preliminary injunction issued by the circuit court of the United States, has been fined for contempt, and is in custody for failing to pay the fine, must he be discharged upon habeas corpus in every case where it appears upon the face of the bill, that the plaintiff has a plain, adequate and complete remedy at law? These questions, it seems to me, should receive a negative answer. I do not understand the court to decide that the circuit court could not under any circumstances, or by any mode of proceeding, enforce the rights which the plaintiffs contend are about to be violated by the defendant; but only, that the court below sitting in equity, had no authority to interfere with the proposed action of the defendants. It seems to me that this question would properly arise upon appeal from any final decree rendered in this cause, and is not determinable upon writ of habeas corpus."

Like reasons were assigned by Mr. Chief Justice Waite for his dissent. And Mr. Justice Gray, in announcing the opinion of the court, said with reference, or it may be said in answer to these arguments so strongly advanced by Mr. Chief Justice Waite and Mr. Justice Harlan, on page 221, as follows:

"Neither do we say that in a case belonging to a class or subject which is within the jurisdiction both of courts of equity and courts of law, a mistake of a court of equity, in deciding that in a particular matter before it there could be no full, adequate and complete remedy at law, will render its decree absolutely void, But the ground of the conclusion is that whether the proceedings of the City Council of Lincoln for the removal of the Police Judge upon charges of mis-appropriating monies belonging to the city, are to be regarded as in their nature criminal or civil, judicial or merely administrative, they relate to a subject which the circuit court of the United States sitting in equity has no jurisdiction or power over, and can neither try and determine for itself nor restrain by injunction the tribunals and officers of the state and city from trying and determining."

Thus it will be seen that the principle involved and decided was that the United States court, sitting as a court of equity, had no jurisdiction over that subject or class of actions involving the protection of the rights of one to hold public office, although the matter might in a proper case be properly determined by the United States circuit court sitting as a court of law; that the general subject matter belonged exclusively to law, and that the order of the court of equity thereon was absolutely void for want of jurisdiction.

The case of Smith v. McKay, 161 U. S., 355, is relied upon as supporting a contrary doctrine. The syllabus 2 of that case on page 355, is as follows:

"When the requisite citizenship of the parties appear and the subject matter is such that the circuit court is competent to deal with it, the jurisdiction of that court attaches, and whether the court sustains the complainant's prayer for equitable relief or dismisses the bill with leave to bring an action at law, either is a valid exercise of jurisdiction and if any error be committed in the exercise of such jurisdiction, it can only be remedied by an appeal to the circuit court of appeals."

And on page 358, the court speaking through Mr. Justice Shiras, said:

"We do not understand the power of the circuit court to hear and determine the case is denied, but that appellates contend that the complainants had not by their bill made a case properly cognizable by a court of equity. The objection was the want of equity and not the want of power. * * * The jurisdiction of the circuit court was, therefore, not in issue within the intent and meaning of the act.'

But it will be noted that the question involved in the case of Smith v. McKay arose out of the rights of the parties to certain patented machines. The bill alleged a failure by the defendants to comply with the terms of a lease for certain patented machines, and prayed for a discovery, accounting, payment of rent and for an injunction restraining the defendant from using the patented machines until they had fully paid the amount found to be due; and the case therefore, clearly belonged to a class or subject which was within the jurisdiction of both courts of law and courts of equity, so that a mistake in granting the relief in equity was clearly not void for want of jurisdiction. That does not affect the proposition here involved. Moreover, the Sawyer case was afterwards followed by the United States Supreme Court in the case of White v. Berry, 171 U. S., page 366, in an opinion, which it is interesting to note was written by Mr. Justice Harlan, who dissented in the Sawyer case.

The case of White v. Berry was to enjoin a collector of internal revenue in West Virginia from removing a gauger for political reasons only, and thus contrary to the express provisions of the Civil Service Law. It was there held that the United States circuit court sitting in equity was without jurisdiction to restrain a plain violation of the law, because it was an action against the officers of another department of the government, and involved the protection only of the political rights of the office holder. And in that case it is reasonable to infer that the court had in view the fact that there was nothing for the removal gauge to do but submit to his unjust and unlawful removal if equity refused him aid.

A most interesting case on this subject is that of Green v. Mills, decided by Chief Justice Fuller on the United States court of appeals, and reported in 69 Fed. Rep., page 852. The syllabus of that case is as follows:

"A court of equity has no jurisdiction upon a bill asking relief in behalf of plaintiff and all of the citizens similarly situated to enjoin the county supervisor of registration from performing the duties prescribed by the state registration laws, on the ground that such laws are unconstitutional and operate to deprive plaintiff and others of the right to vote."

On page 857 Mr. Chief Justice Fuller says:

"It is well settled that the court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of the government, unless under special circumstances and when necessary to the protection of rights of property, nor in matters merely criminal or immoral, which do not affect any property right."

The court there quotes from the case of Hardesty v. Taft, 23 Md., 513, as follows:

"On this branch of the inquiry it seems to the court very clear that the aid of a court of equity cannot be invoked to prevent the performance of political duties like those committed to the officers of registration under the law. * * * * The right of injunction will not be awarded in doubtful or new cases, not coming within well established principles of equity.'

The decisions of other states are equally emphatic on this subject. In Dickey v. Reed, 78 Ill., 261, there were proceedings in contempt against the aldermen and city clerk of Chicago for disobeying an injunction restraining them from canvassing the returns of an election. The grounds for issuing the injunction were numerous frauds and illegalities charged. It will be noted that the act of canvassing the returns which was restrained was purely ministerial act, and yet the parties were discharged from the contempt for want of jurisdiction. On page 271 the court said as follows:

"It has been held that a court of equity has no power to try a contested election case even where the statute has not provided a mode for contesting it. Elections belonging to the political branch of the government and are beyond the control of the judicial

power. It was not designed, when the fundamental law of the state was formed, that either department of government should interfere with or control the other and it is for the political power of the state within the limits of the Constitution, to provide the manner in which elections shall be held and the manner in which officers thus elected shall be classified and their elections contested. And the political power of the state may organize municipal bodies and put them into operation by the force of enactment or by election by the people to be thus governed, and they can provide the mode of reviewing the returns of all elections to ascertain whether they are in accordance with the expressed will of the people, and, until the courts are empowered to act by the constitution or legislative enactment, they must refrain from interference. * * * * We are aware of no adjudged case or text writer who has ever announced the power as inherent in courts of equity to try contested elections between persons claiming an office or in a case of this kind."

Afterwards, in Fletcher v. Tuttle, 151, Ill., page 41, the same doctrine was announced in an application for injunction on behalf of a candidate for the General Assembly of the state, who was about to be deprived of his right to run for that office by proceeding to an election under an alleged void redistricting bill. It will also be noticed in the case of Fletcher v. Tuttle, that the proceedings were against election officers to restrain them from the performance of a purely ministerial duty, which it was alleged would result in the violation of the law and destroy the right of the complainant to run for the legislature. It was held in the lengthy and interesting opinion, that a court of equity was without jurisdiction, in the premises.

On page 57 the court said:

"Other authorities of similar import might be referred to, but the foregoing are amply sufficient to show that wherever the established distinctions between equitable and common law jurisdiction are observed, as they are in this state, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all cases the remedy, if there is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery cannot, therefore, be invoked to protect the right of a citizen to vote, or to be voted for at an election, or his right to be a candidate for, or to be elected to any office. Nor can it be invoked for the purpose of restraining the holding of an election or of directing or controlling the mode in which or by determining the rules of law in pursuance of which an election shall be held. These questions involve in themselves no property rights, and pertain solely to the political administration of government. If a public officer charged with political administration has disobeyed or threatened to disobey the mandate of the law, whether in respect to calling or conducting an election or otherwise, the party injured or threatened with injury in his political rights is not without remedy, but his remedy must be sought in a court of law and not in a court of chancery."

As bearing upon the question of political and civil rights herein, it is interesting to note the case of Fletcher v. Tuttle, quotes with approval the following definition of political and civil rights, from 2 Bouvier's Law Dictionary, 597:

"Political rights consist in the power to participate directly or indirectly in the establishment or management of the government. These political rights are fixed by the constitution. Every citizen has the right of voting for public officers, or of being elected; these are the political rights which the humblest citizen possesses. Civil rights are those which have no relation to the establishment, support or management of the government. They consist in the power of acquiring and enjoying property, or exercising the paternal and marital powers and the like. It will be observed that every one, unless deprived of them by sentence of civil death, is in the enjoyment of his civil rights—which is not

the case with political rights, for an alien, for example, has no political, although in full enjoyment of his civil rights.''

We think, in view of this definition, that the rights of the plaintiffs in the original injunction suits herein, were strictly political rights, and it would therefore seem that the protection of such rights must be left to courts of law for enforcement, or the party be left to his right of contesting, and if there be such means provided, then the criminal code must be resorted to; and in section 7043, 7057 and 7058 of the Revised Statutes of Ohio there are ample means for punishing a judge of election who knowingly refuses a legal vote or who knowingly receives an illegal vote.

As tending to show that section 2948, was not intended to be equitably enforced, the case of State ex rel. Keiser v. Commissicners, 57 Ohio St., page 86, construing the so-called Clark law, is instructive if not entirely in point. The syllabus of that case is as follows:

"The act of the legislature passed March 3rd, 1896, amending the act of April 2rd, 1888, regarding preference in public employment to be given honorably discharged soldiers, sailors and marines in the late rebellion, cannot be enforced by mandamus."

On page 91, the court, passing upon the application for mandamus, and refusing the same, said:

"If there be any remedy for an omission of this kind on the part of the commissioners, it must be by indictment, as provided in section 2 of the amendatory act, or else by an appeal to the people at the proper time in the election of the county commissioners."

Therefore, although the question has not heretofore been directly decided, in this state, I think it must be held that a court of equity can not interfere for the protection of the political rights of one seeking to be elected to office where such interference consists in enjoining the officers or agents of the executive or administrative department of the government from the performance of some act ordinarily pertaining to that department; and if such injunction is issued it is void for want of jurisdiction.

I do not consider it necessary to determine if the duties devolving upon the judges of elections are ministerial, or whether they involve the exercise of discretion, because it seems to me that the same result follows if the duties be admitted to be purely ministerial although on the subject of the exact nature of the duties of the judges of elections, I might say that there is in my mind considerable doubt.

I have found but one decision in Ohio that is at all in conflict with these views, and that is the decison of Judge Rufus B. Smith of this court, in the case of Oliver v. Bode et al, 3 Nisi Prius, 208. There a mandatory injunction was issued against the board of elections at the instance of the Democratic nominee for Congress, requiring the said board of Elections to withdraw instructions issued to judges of elections prohibiting the candidate from having witnesses and challenges at each voting precinct. But it will be seen from the opinion that the only questions there discussed were the consruction of the statutes. It was assumed that the court had jurisdiction, and I am authorized by Judge Smith to say that the question of the want of jurisdiction was not raised or even suggested on the hearing of that case. The citation from High on Injunctions in Judge Smith's opinion does not support the jurisdiction, but relates to injunctions against public officers to protect property rights.

The next matter for consideration is, how is the question of equity jurisdiction affected by the fact that the plaintiffs in the injunction cases herein were seeking election to a convention of a political party. It is beyond question that a political convention is ordinarily the sole judge of the elections, returns and qualifications of its own members. Being a voluntary association, it must necessarily follow that no one has a right to participate therein against the rules and regulations, and contrary to the wishes of the association itself. This rule is,

moreover, abundantly sustained by authorities.

In Stevenson v. Commissioners, 7 N. W. Rep. (Mich.), the court refused to decide between rival factions of the Republican party to determine who was legally nominated for Congress. On page 915, the court said:

"The assembly is a law unto itself, and has uniformly been the judge of the qualifications of its own members, and its decision is final."

The same rule was announced in Marcum v. Commissioners, 42 W. Va., 263. The syllabus is as follows:

"In passing upon the right of nominees for public office to appear on election ballots, this court recognizes the right of the convention making them, to judge of the election, qualification and returns of its own members, and will not go back of this action to inquire as to the right or title of delegates admitted by it as members."

A similar doctrine was announced in McKane v. Adams, 123 N. Y., 611. There the plaintiff sought an injunction against the members of the executive committee of the Democratic party of Kings county, New York, to prevent the members from interfering with his right to participate as a member of said committee, to which he alleged he had been duly elected. The court refused the relief. On page 612 the court said, speaking of participation in political associations.

"It is by reason of the action and of the assent of members of a voluntary association that one becomes associated with them in a common undertaking, and not by any outside agency, or by the individual's action. Membership is a privilege, it may be accorded or withheld—and not a right which can be gained independently and then enforced. So when, as by the plaintiff's own showing, the committee refused to admit him as a member or to permit his election, he was remediless against that refusal. No rights of property or of person were affected, and no rights of citizenship were infringed upon."

Nothing can illustrate the utter futility of courts interfering in political matters so well as the cases of In re Woodworth, 16 N. Y. Supplement, 147, and In re Pollard, 55 N. Y. St. Rep., 155. To a full understanding of these cases it should be stated that at the time of these decisions there existed in New York state a statutory provision expressly empowering the courts to decide who was entitled to the certificate of nomination at the hands of a political convention.

Pursuant to this express statutory authority so to do, the court in the Woodworth case, 16 N. Y. Supplement, 147, determined as between two rival county conventions of the Republican party, which was the regular Republican organization, and ordered the clerk to act accordingly. But thereafter the question came up again because subsequent state, congressional, and judicial conventions ignored the faction recognized by the court as the regular Republican organization, and the court was again asked to interfere. This was declined, notwithstanding the statute expressly authorized it so to do; the court saying in re Pollard, 55 N. Y. State Rep, 156, after referring to its former decision in the Woodworth case as follows:

"I still think, as already stated that the title to the regularity of the Patterson faction was pretty clearly established upon the original hearing, and that it would, in view of the provision of the statute which authorizes this proceeding, have been no more than courteous for the party conventions to have adopted the decision of the General Term, which was deliberately made after a careful and impartial hearing; but there is no way in which they can be compelled to do so, and consequently it seems to be that the only rule for the courts and judges to adopt, in this and all other similar contests, is that they will interfere only in cases where there has been no adjudication of the question of regularity by some division of the party, which is conceded to be superior in point of authority to the one in which the contention arose, provided of course, that the question of good faith in the making of such adjudication is not involved"

What conclusion must follow from the rule of law that a political convention is a law unto itself, and that its proceedings cannot be controlled by the courts? The result must be that courts have no jurisdiction to say, in the first instance, what votes shall or shall not be counted for delegates in such convention. For if it be conceded that the courts can so act with regard to controlling the action of the judges in counting ballots, it then follows that for the protection of its own dignity, it must see that the result of having certain ballots excluded from the count is carried out, and that it will not suffer that result to be defeated by any one, not even by the members of the convention itself acting in contemptuous disregard of its orders. If excluding certain ballots from the count results in the election of certain delegates, then the court, for the protection of its own dignity, must see that those delegates are given seats on the floor of the convention. But this result not only destroys the rule well recognized by all courts, that a convention is the sole judge of the elections, &c., of its own members but it puts it in the power of the court to dictate to and to absolutely control the proceedings and actions of the convention.

As stated in Dicky v. Reed, supra: "The expansive force of precedent may be said to be almost unlimited."

So if litigants could come to court in this case they could come in others where the provisions of the statute are not so manifest and are somewhat doubtful, and thus one judge of a court might usurp the functions of a political convention and hush the real voice of the party, or else be brought into an unseemly political wrangle. This view would not deny to a court of law the power to compel by mandamus the judges of election to give a certificate of election to a delegate, but the court would regard such certificate as merely prima facie evidence of the right to sit in the convention and subject to the decision of the convention itself.

The distinguished gentlemen of the committee franky concede this result, but say as before stated, that a party convention loses its character of a voluntary association and relinquishes its right to be the sole judge of the elections, qualifications and returns of its members when it decides to hold primary elections for the election of delegates pursuant to the statute. It is impossible for the court to take this view. A sufficient answer to this suggestion is that these associations are not created by statute, but merely recognized by the statute, and that unless expressly or by clear implication prohibited by statute, they possess all their original powers. We find nothing in the primary law that expressly or impliedly curtails their powers in this respect, but we do find a provision prohibiting the giving of proxies by delegates to the convention. The fact that this well known prerogative is expressly prohibited by statute, should incline us to think that none others were intended to be excluded on the principle of expressio unius exclusio alterius.

We cannot agree that the action of the judges of the election in receiving and counting the votes must be conclusive upon the convention, but if the convention wantonly and wrongfully disregarded the action of the judges in this respect, it would present a strong argument to the people against voting for the candidates nominated by such convention.

In this connection I may say that the right of every candidate to be present and witness the count will enable him to secure all the information necessary for the contest before the convention if illegal votes are actually counted.

The conclusion is that this statute was not intended to be enforced by the equitable remedy of injunction, because no express power is given by our statutes to courts of equity to enforce political rights of this character; but that the remedy of the party aggrieved is the legal right of quo warranto if time permits between the election and the holding of the convention, or by contesting before the convention itself: and that in addition to this remedy of the party himself,

the offending parties may be punished criminally for violating this provision of the statute. These and the always powerful remedy of the right of appealing to the people are the only ways of enforcing this statute.

I have stated that these considerations against the jurisdiction of the court were not urged at the hearing for the injunction, but I do not by this mean to reflect upon the zeal and ability of counsel, nor do I thus desire to avoid my full share of responsibility for issuing the injunction, which now I see was void for want of jurisdiction. But it must be said that the extreme urgency attending the application for the injunctions made it impossible to consider these matters at that time.

It follows that all charges of contempt herein must be dismissed.

*Wm. Worthington, John F. Follett,* and *Aaron A. Ferris,* for Charges of Contempt.

*James B. Swing, C. B. Matthews, Frank Dinsmore, Wm. Littleford,* and *H. L. Gordon,* contra.